# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs December 10, 2014

## IN RE: BRYCE F.

**Appeal from the Juvenile Court for Knox County**
**No. 51735     Tim Irwin, Judge**

**No. E2014-01380-COA-R3-PT-FILED-DECEMBER 30, 2014**

The State of Tennessee Department of Children's Services ("DCS") filed a petition seeking to terminate the parental rights of Lori D.F.P. ("Mother") to the minor child Bryce F. ("the Child").  After a trial the Juvenile Court for Knox County ("the Juvenile Court") terminated Mother's parental rights to the Child after finding and holding, *inter alia*, that grounds had been proven by clear and convincing evidence to terminate Mother's parental rights for abandonment by willful failure to pay child support pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(i); for failure to substantially comply with the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2); and for severe child abuse pursuant to Tenn. Code Ann. § 36-1-113(g)(4), and that the termination was in the Child's best interest.  Mother appeals to this Court.  We find that the evidence does not preponderate against the Juvenile Court's findings made by clear and convincing evidence, and we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**
**Case Remanded**

D.  MICHAEL SWINEY, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY, and THOMAS R. FRIERSON, II, JJ., joined.

Anne Greer, Knoxville, Tennessee, for the appellant, Lori D.F.P.

Herbert H. Slatery, III, Attorney General and Reporter; and Ryan L. McGehee, Assistant Attorney General, for the appellee, State of Tennessee Department of Children's Services.

# OPINION

## Background

The Child was born drug exposed in February of 2013. He was removed from Mother's custody and placed in foster care in March of 2013. DCS filed the petition seeking to terminate Mother's parental rights to the Child on February 25, 2014, and the case proceeded to trial in October of 2014. The parental rights of the Child's legal father were terminated prior to trial, and the Child's biological father was deceased. The Child's biological father died of a drug overdose. The Child was approximately nineteen months old at the time of trial and had been in the same foster home since he entered State custody.

Brianna Monroe testified that she had been the Child's DCS case manager since the Child entered foster care in March of 2013. Ms. Monroe testified that Mother had five children, four of whom were living at the time of trial. The three oldest of Mother's children were living with their great-grandparents. The fourth child had been born drug exposed, discharged from the hospital to Mother's care, and died in October of 2010. After the death of their sibling, Mother's three oldest children were removed from Mother's care and placed with their great-grandparents. The Child is the youngest of Mother's children.

Ms. Monroe testified that in November of 2011, Mother appeared to be doing well and further testified that Mother "had completed the requirements that are asked of her with her mental health assessment and she was doing fine. She reported that she wasn't on Methadone." Mother testified in court at that time that she was not using methadone.

The Child was born drug exposed in February of 2013 and tested positive for methadone and benzos. Ms. Monroe testified that even though Mother had testified she was not using methadone, Mother had been using methadone continuously. Ms. Monroe was asked how the Child has done with regard to being born drug exposed, and she stated:

> [The Child] has done okay. He is thriving in his current foster home. But there are concerns - - there have been concerns with possible seizures in terms of being - - they are currently concerned with his growth. He is having to see a neurologist, a GI doctor, a nutritionist. They were able to rule out seizures. I think he still has an appointment for a follow-up there. He is seeing a GI regularly.

A permanency plan was developed for the Child in April of 2013 ("the Plan")[1]. Pursuant to the Plan, Mother was to obtain and maintain stable housing, remain law abiding, obtain an A&D assessment and follow all recommendations, submit to random drug screens, follow all previous orders regarding her participation in methadone clinics, and pay child support, among other things. Mother reported to Ms. Monroe that she was working. Mother made a child support payment in October of 2013 and an IRS intercept was made in February of 2014 for child support.

Mother completed an alcohol and drug assessment with Solution Source in July of 2013. The assessment recommended that Mother continue compliance with her methadone treatment, medication management, case management and therapy, and individual therapy. DCS paid for Mother to have therapy at Solution Source. Ms. Monroe testified that Mother "complied [with the therapy] minimally and was discharged noncompliant September 26th, 2013."

Mother was to continue with her methadone program and develop a weaning plan. Ms. Monroe testified that Mother did so initially, but that Mother quit the methadone clinic at the end of November of 2013. Mother was working on stepping down her drug use when she was in the methadone program. Mother reported that she was attending NA meetings. Ms. Monroe asked Mother for documentation of this attendance, but did not receive anything until a few days before trial.

In March or April of 2014, after the Juvenile Court released DCS from making reasonable efforts, Ms. Monroe received a call from Solution Source asking if DCS would again pay for Mother's treatment. Solution Source reported that Mother was noncompliant with therapy in September of 2013 and noncompliant with case management in January of 2014.

Ms. Monroe testified that she drug screened Mother during the four months prior to trial. Ms. Monroe testified that Mother cooperated with three of the drug tests, and failed to cooperate with three other drug tests. Mother tested positive for methadone at a court hearing on December 10, 2013. Mother had a clean drug screen a few days later on December 13, 2013, and then tested positive for methadone again at her next drug screen on December 18, 2013.

Since December 10, 2013, Ms. Monroe has attempted to drug screen Mother four times. One of those times Ms. Monroe went to Mother's home to drug test Mother and

---

[1]A second permanency plan was created for the Child in October of 2013. The second plan contained substantially the same requirements for Mother as the initial plan.

Mother told her that she was about to call a cab to go to the ER because she was ill. Ms. Monroe gave Mother a ride to the ER and did not drug screen her on that day. On April 7, 2014, Ms. Monroe called and texted Mother requesting that Mother come in for a drug test. Mother responded to the text with a text message stating "hey," but did not appear for testing. Mother failed to show up for a drug screen on April 29, 2014. Ms. Monroe testified that she had spoken to Mother, but Mother failed to show up. Ms. Monroe was able to drug screen Mother three times during this time period. On one of those drug screens, Mother tested positive for benzos, and did produce a prescription pill bottle.

The Child entered foster care in March of 2013. During the time the Child has been in foster care, Mother was drug tested with the following results:

On May 10, 2013, Mother tested positive for cocaine, benzos, opiates, and methadone.
On July 25, 2013, Mother tested positive for methadone, for which she had a prescription.
On August 15, 2013, Mother tested positive for methadone.
On September 23, 2013, Mother tested positive for methadone.
On October 9, 2013, Mother tested positive for methadone.
On October 30, 2013, Mother tested positive for methadone.
On December 10, 2013, Mother tested positive for methadone.
On December 13, 2013, Mother had a clean drug screen.
On December 18, 2013, Mother tested positive for methadone.
On January 15, 2014, Mother had a clean drug screen.
On February 4, 2014, Ms. Monroe took Mother to the ER and was unable to drug test Mother.
On April 7, 2014, Ms. Monroe received the "hey" text in response to her request for Mother to submit to a drug test, and Mother did not appear for testing.
On April 11, 2014, Mother had a clean drug screen.
On April 29, 2014, Mother failed to respond to the request for a drug test.
On May 13, 2014, Mother tested positive for benzos and produced a prescription.
On June 23, 2014, Mother had a clean drug screen.

Ms. Monroe testified that Mother received new criminal charges in Anderson County in September of 2013 and was arrested in Knox County in March of 2014. Neither of these arrests involved child support.

Liz Priode testified that she is an in-home counselor with Camelot Care Center, a therapeutic foster care agency. Ms. Priode sees the Child in the foster home or at medical appointments at least once a week and does visitation with Mother. Ms. Priode testified that:

[The Child] had many issues, which the foster parents could even elaborate on that. Of course he was born addicted, which he was on medications to help him get through that. He has weekly [Tennessee Early Intervention Services], which Ms. Monroe mentioned. He has had a lot of nutritional problems.

When asked about the Child's nutritional problems, Ms. Priode stated: "He was on the low scale and had - - I mean, he had many nutritional issues because of the developmental delays with the drug abuse." Ms. Priode testified that the Child has some special dietary needs and is allergic to milk.

The Child's foster mother ("Foster Mom") testified at trial. She explained that her household consists of her, her husband, her two sons who are 15 and 9 years old, and five foster children who are 8 years old, 5 years old, 2 years old, 17 months old, and 9 months old. Foster Mom testified that she and her husband are prepared to adopt the Child if he becomes available for adoption.

Foster Mom was asked how they handle all the children in her household, and she stated:

Everybody has a buddy. The two newest ones [the 2 year old and the 9 month old] just came in Friday night, so we are adjusting a little bit. But every big kid has a little kid buddy. [The Child's] buddy is actually my 15-year-old. That seems to be who he would rather be a buddy with than anybody else. So he gets him out of the car, walks him in to wherever we are going. But every big buddy has a little buddy and everybody has somebody's hand when we go.

Foster Mom was asked about the Child's issues, and she stated:

He came home on phenobarbital, so we weaned him off of that the way that they told us to. He actually does really, really well with all of his developmental milestones. TEIS comes and sees him once a week.

I was the one who became concerned about the seizures but the neurologist has said that he is just thinking really hard. I didn't know that one year olds think really hard but they do. And I guess the first time that I was worried about that was in August of 2013, because he was really little when he was thinking really hard. And so he has had two EEGs to make sure that he does not have seizures.

He came home on soy and you keep that at home. It is pre-made. But when we tried to transition to powder his GI tract didn't tolerate that. He had diarrhea really bad. So we had to continue on concentrate as opposed to powder. And he did okay with that, but it was soy. Then when we tried to transition to regular milk, at one year of age, he didn't tolerate that transition either, and that is how we became aware that he is allergic to all dairy products.

And it's not just milk, it's everything. So even if he goes somewhere, and they fry chicken tenders that are battered with buttermilk in a fryer, then they fry his french fries in that same fryer, he will react. And that initially just started as GI symptoms, but now his face breaks out if he gets into something that is dairy based.

Foster Mom was asked about the Child's medical appointments, and she stated:

We see Dr. Weinstein every three months. She suggested that that take place until he is three years of age unless he makes leaps and bounds. He has TEIS once a week. He sees the nutritionist every four to six weeks and a GI, the GI doctor that's connected to the nutritionist every four to six weeks also. And they schedule opposite of each other, so we are there about every three weeks.

He saw an endocrinologist because the GI specialist was worried that his bone age study was in the young range of where he would be normal, but the endocrinologist doesn't want to follow up unless one of the other specialists say that he needs to come back.

We have seen the neurologist once to confirm that the EEG says that he is not having seizures. And we have seen the urologist when he was circumcised in June.

Mother testified that she was 33 years old at the time of trial. Mother admitted that she spent time in prison for robbery and theft, and stated: "I went to prison at the age of 19. And I did go to prison for three years, about three and half [sic] years, then I paid my debt to society." Mother stated that the theft was of a car and the robbery was of a convenient store with a pharmacy.

Mother testified that her oldest child was 16 years old at the time of trial, and that the Child was the youngest of her children. Mother admitted that she and the Child tested positive for benzos at the time of the Child's birth. Mother was enrolled in a

methadone clinic at that time. When asked why the Child was born positive for benzos, Mother stated: "Because I have serious panic attacks since I've been 12 and I've been on medication. I had a panic attack and I took it, and I am not going to sit here and say I didn't because I did." Mother was asked if she took any benzos prior to that time, and she stated: "No. Twice, once right before [the Child] was born and I think two or three weeks, something like that before he was born."

Mother testified that the last time she used methadone was December 2, 2013. Mother was asked if she had used any since that day, and she stated: "No, ma'am." Mother was asked why she stopped going to the methadone clinic, and she stated: "Because Jennifer came out in November and told me I would not have my kids back unless I was off the clinic. So I took my last two weeks and I lowered myself down myself and got off of it. . . . And it was hell."

When asked what she was doing to follow up with aftercare from her methadone treatment, Mother stated: "I have got a sponsor and I go to NA meetings." Mother produced some sign-in sheets from NA meetings and stated that she tries to attend two or three NA meetings a week. Mother produced a sign-in sheet for NA meetings showing that she began attending meetings in March of 2014. Mother testified: "I didn't just start NA meetings in March. That's the only ones I could find. And also, I didn't know I was supposed to be signing them in." Mother then was asked if signing in to the meetings was optional, and she stated: "Well, no. I signed their thing." Mother was asked if she had requested the NA records back to August of 2013, and she stated: "I didn't know I could."

Mother was asked why she did not show up for the requested drug screen on April 7th, and she stated: "If I am correct, April 7th I think I was at work and I told her I would try to come the next day. And I came in and she wasn't there, because that was the exact date I am thinking of. And I did call her and texted." Mother was asked why she did not go on April 29th, and she stated: "Give me just one second. I am trying to remember. If anything, I was working and - - ."

Mother was asked about her arrest on March 31st, and she testified that it was for driving on a suspended license. Mother stated that it was resolved because she pled guilty for a first offense of driving on a suspended license. When questioned further, Mother admitted that her license still is suspended. Mother testified that she got to court for the trial by driving herself. Mother also admitted that she still owes fines.

Mother testified that her arrest in Anderson County in September was for "[p]ossession of Schedule II which was my Methadone. It was Methadone." Mother then stated that she was driving Bobby's car, and the methadone was his "which he told my

attorney. But my attorney passed away, so that was hearsay, so - - ." Mother was expecting those charges to be dismissed. Mother testified that the methadone was in the car with her. Mother was asked why the car was stopped, and she stated: "Because I have no driver's license. . . . I was at the bottom of my friend's driveway." Mother was questioned further, and she stated:

> They stopped my car because I had - - I was setting there. . . . I was setting there waiting. I had a bad headache and I took some Benadryl. Every time I tell you-all the truth you-all make it - - . . . . This is what happened. I was - - I had a headache for three days. I thought it was sinuses. So I got some Benadryl. I took the Benadryl. And obviously it make me sleepy. So I was at the bottom of the driveway, in park, and fell asleep. And all of that stuff was in there, which I didn't know.

Mother was asked if she was charged with vandalism based on impact that caused damage to the police car, and she stated: "They hit my car obviously, because my car was rolling." When questioned further, Mother admitted that she had her methadone in a bottle in the car and stated "but the rest of it was Bobby's." Mother testified that she does not remember hitting the police car, but admitted that she remembers being charged with possession of a Schedule II drug, evading arrest, and driving on a suspended license.

Mother was asked about her arrest in March, and she stated that it was for speeding. Mother then was shown a document, and she stated:

> This is not right. I was not asleep at a gas pump. I was texting at a gas pump, because I don't text and drive. I was looking down. And the officer knew me, because he is my cousin's friend. They knew I had no driver's license. So when he come up to me, I said I don't have a driver's license. I am not going to lie to an officer that I have a driver's license when I don't.

> My driver's license are [sic] suspended for failure to satisfy a citation. This did occur in Knox County, Tennessee. The citation was not issued because likely the offense will continue.

Mother then was asked why she had just stated she was speeding, and she stated: "Well, I thought - - I have got another driving on suspended where I was speeding or something. . . . Last year sometime." When questioned further Mother stated: "I forgot. Yeah. But I am not trying to lie. I have so much stuff going on that I have to literally keep a book of appointments and issues going on that I have to keep a book."

Mother was asked about how she gets to the Child's visitations and appointments, and she stated that she drove. She stated: "I know I'm not supposed to, but I want to make it to my kids' appointments." Mother was asked if she was working on getting her license back, and she stated that she owes thirteen hundred more dollars. She stated that she is paying on it and tries to pay at least $50 per month.

Mother testified that she has a job doing commercial cleaning of cabins and that she is paid $9.75 per hour. Mother testified that she works "anywhere from 25 to 35 to 40 hours a week," and that she works every week. Mother testified that she provided a letter from her employer that stated that she had worked for them since 2008.

Mother testified that she did make child support payments while the Child was in State custody. According to Mother's testimony, she paid $10 on August 27, 2013; $20 on October 7, 2013; $20 on February 25, 2014; $140 on May 16, 2014; and $220 on July 16, 2014. She further stated: "on that day of 5/16/2014 I paid 60 more dollars. And July 16th, 2014, I paid 220. And I paid more but I can't find the receipts on those." Mother testified that she was trying to make payments "[a]s much as I can."

Mother was asked why she did not make regular child support payments from October of 2013 to February of 2014, and she stated:

> Well, I was making as much as I could in October. I wasn't getting that many hours due to all of the appointments I have. And losing Bobby - - you know, me and him split up in October. Actually, yeah, October. I didn't have that much money, so I was trying to, how do you say it, pay my bills and take care of the other children. I don't just have [the Child], I have obligations to my other children also and I, of course, try to give money to them too.

Mother admitted that in February there was a tax intercept for child support for the Child in the amount of $1,025.

Rebecca Murphy testified that she is Mother's NA sponsor. Ms. Murphy met Mother at a NA meeting at the end of August of 2013. Ms. Murphy stated that she and Mother talk daily or every other day, and she sees Mother once a week at NA meetings. Ms. Murphy testified that Mother had shared with her that one of Mother's triggers was depression and that Mother became an addict by using street drugs to treat depression. Ms. Murphy testified that Mother has done all twelve steps of the program since August. When asked what she does for Mother, Ms. Murphy stated: "I am a shoulder to cry on. I help her through her daily struggles. . . . As well as she helps me through mine at times."

Ms. Murphy testified that she and Mother have been in constant contact since August of 2013. Despite testifying that she had almost daily contact with Mother since August, Ms. Murphy admitted "I can't recall about the relationship with her and Bobby; I apologize." Ms. Murphy did not know anything about who Mother was living with. Ms. Murphy knew that Mother had been in methadone treatment, but when asked when the treatment stopped, Ms. Murphy stated: "Oh, my goodness. Honestly I don't know. I can't recall that. I don't know."

Carolyn B. ("Great-Grandmother"), who has had custody of Mother's three oldest children, testified at trial. Great-Grandmother testified that she drove to trial, and that Mother's oldest child and Pamela F., who is Mother's mother, rode in the car with Great-Grandmother. Great-Grandmother was asked what she knows about Pamela F., and she stated:

> Well, I know that she was supposed to not be allowed to take care of the kids. I don't know about these, I am talking about some other kids. And - - because she tested positive for drugs - - this was in - - I don't know what year it was - - and - - but since then she has only been doing what medication was prescribed to her.

When questioned further, Great-Grandmother admitted that she only knows what Pamela F. tells her about whether Pamela F. still is using un-prescribed drugs. Great-Grandmother testified that Pamela F. needed a ride to court because she was supposed to attend a hearing regarding some of Great-Grandmother's other great-grandchildren, whose mother went to jail for driving without a license. Great-Grandmother was asked how much contact she has allowed Pamela F. to have with Mother's children, and she stated:

> Like maybe once every month or two she'll come out for a few minutes. But she doesn't have any supervision over them. . . . She usually just comes over there to say hi or something. I don't know what she comes for. . . . I know, but she just visits. She don't do anything.

Great-Grandmother was asked if she knew there was a no contact order preventing Pamela F. from having contact with Mother's children, and Great-Grandmother stated: "Well, I thought it was just that she - - I didn't know that she couldn't like be around."

Great-Grandmother admitted that she had learned that Mother had a history of delivering children who had been drug exposed in utero, but testified that she did not know that Mother was using drugs during pregnancy. Great-Grandmother admitted that when two of Mother's older children went back to Mother's custody for a period of time, the oldest of

-10-

Mother's children stayed with Great-Grandmother because this child and Mother would fight and argue and couldn't get along with one another.

Mother's oldest child ("Daughter"), who was sixteen years old at the time of trial and pregnant, testified on Mother's behalf. Daughter testified that she has seen the Child only twice. Daughter would like for the Child to be a sibling to her and Mother's other children. When asked how Mother was doing, Daughter stated: "I think she is doing excellent for her situation."

After trial, the Juvenile Court entered its detailed Termination of Parental Rights and Final Decree of Guardianship order on August 28, 2014 after finding and holding, *inter alia*:

1. [The Child] was born during the marriage of [Mother] and [James W.P.] . . . . The child's birth certificate shows [Bobbie D.F., Jr.] as the child's father rather than his mother's husband. The temporary custody of this child was awarded to the State of Tennessee, Department of Children's Services, on March 20, 2013, by order of the Juvenile Court of Knox County, Tennessee; he has been in foster care continuously since that date. An order finding the child dependent and neglected was issued by this Court following a hearing on July 31, 2013. The termination petition was filed against [Mother] on February 25, 2014.

II

1.    This child was removed from [Mother's] custody due to her substance abuse. [The Child] is [Mother's] fifth child. Her fourth child, Audiona, was born on July 17, 2010. She had been exposed to methadone and benzodiazepines *in utero* and died a few months after being released from the hospital to her mother's care. [Mother] was indicated for severe abuse (neglect death) by the Department of Children's Services.

2.    After Audiona's death, [Mother's] three older children (two of whom had also been born exposed to methadone *in* utero [sic]) were removed from her care and placed with relatives. She cooperated with services recommended by the Department of Children's Services and pass [sic] random drug screens. At a hearing on November 30, 2011, she testified that she was no longer using methadone or any non-prescribed medication. She agreed that she would not take any methadone or suboxone, prescribed or otherwise, and that was part of this Court's order. Over the objection of the Department of Children's

-11-

Services, custody of two children was returned to her on that date. [Mother's] oldest child remained in the custody of the child's maternal great-grandparents.

3. When [the Child] was born on February 20, 2013, he too was found to have been exposed to methadone and benzodiazepines *in utero* and required hospitalization for more than one month for treatment of Neonatal Abstinence Syndrome. [Mother] had actually resumed using methadone in August 2011, several months prior to her testimony in November 2011, and had used it continuously thereafter. [The Child] was removed into foster care prior to his discharge from the hospital; the children's great-grandmother regained custody of the other two children in [Mother's] care at that time. [Mother] has not regained custody of any of those children.

4. Following a hearing on June 17, 2013, this Court found that "[the Child] was the victim of SEVERE ABUSE, as defined in TCA § 37-l-102(b)(23)(A), by [Mother] based on

> a.     his mother's awareness, during her pregnancy with this child, that her use of illicit benzodiazepine in combination with her prescribed methadone could cause severe bodily injury or death to her baby. The mother was provided with written warning by her methadone treatment program on November 6, 2007, that methadone is transmitted to her unborn child and that using unauthorized drugs in addition to her prescribed methadone could harm her unborn child. She was provided with additional written warning on June 10, 2009, that combining benzodiazepine with methadone treatment could have serious health risks including decreased respiration, heart complications and potential death and that withdrawal syndrome might require hospitalization. The mother was aware that she had been indicated for severe abuse by the Department in 2010 after another of her children, [Audiona] (deceased), was exposed to methadone and benzodiazepines in utero. [The Child] had to be placed in the NICU for over a month, experienced symptoms of withdrawal, included [sic] an excessive high pitch cry, moderate to severe tremors, excessive sucking, poor feeding, and loose stools, and nasal stuffiness, and had to be treated with Diluted Oral Morphine and Phenobarbital while in the NICU and to be released home with Phenobarbital Elixir taper to address his withdrawal symptoms. This is evidence to the Court that the

child suffered as the result of the mother's use of drugs that the mother knew could be harmful to the child; and

b.      her use, despite this knowledge, of illicit benzodiazepine in combination with her prescribed methadone during her pregnancy with [the Child], leading him to test positive for benzodiazepine and methadone, to suffer though drug withdrawal, and resulting in the need for his admission to the NICU and treatment with morphine and phenobarbital.

5.      The permanency plan was developed at a Child & Family Team Meeting on April 17, 2013, with [Mother's] presence and participation. Among other things, the plan required that [Mother] (a) complete an alcohol and drug assessment, follow resulting recommendations, comply with all previous orders regarding her participation in methadone clinics, and pass random drug screens to demonstrate sobriety; (b) complete a mental health assessment and follow resulting recommendations including taking any medication as prescribed; (c) obtain and maintain safe, suitable housing free from environmental hazards, domestic violence, illegal activity, or other risks to the child; (d) obtain and maintain a legal source of income to support her family; and (e) maintain her status as a law-abiding citizen. She was also expected to visit regularly and to pay child support.

6.      [Mother] completed a mental health and alcohol and drug assessment at The Solution Source on July 16, 2013, paid for by the Department of Children's Services. Based on her self-report, the evaluator recommended that [Mother] continue compliance with her methadone treatment provider, receive medication management, case management, and individual therapy. She was to develop a weaning plan. [Mother] began all recommended services through Solution Source, again at no cost to her. She testified that she was discharged from therapy after five to seven sessions due to lack of insurance. The child's case manager disputed this version, insisting that [Mother] was discharged from both individual therapy (in September 2013) and from case management services (in January 2014) for non-compliance, facts known to the case manager because the Department of Children's Services was being billed for [Mother's] treatment. This Court previously resolved that issue at a hearing on February 24, 2014, where the Court found that [Mother] was not in compliance with the plan, in part, because she was not participating in mental health counseling and had been released from her mental health services due to non-compliance. As part of that order, this Court relieved the Department of Children's Services from making further reasonable efforts to reunify this

child with his mother. When [Mother] subsequently attempted to resume mental health services, she was advised that the Department would no longer pay for them.

7. During the first several months of this foster care episode, [Mother] reported that she was continuing to cooperate with a methadone clinic in Georgia and that she had developed a long-term weaning plan. Her positive screens for methadone were consistent with the report. At a hearing in this Court on December 10, 2013, [Mother] testified that she had quit treatment and that her last use was a "take-home" dose of 10 mgs. on December 2, 2013. She was nevertheless positive for methadone on a drug screen obtained by Court staff, a drug that should not be present more than 72 hours after use. She was ordered by the Court to return for urine drug screens on December 13, 2013, and December 18, 2013. The first of those screens was clean; the second was again positive for methadone. Although [Mother] has failed to appear for several requested drug screens, she has not had a "dirty" screen during this calendar year. It appears to the Court that she is now off methadone. If so, she is one of the very, very few; it's a difficult thing to do. But it's very, very late.

8. The Court is not particularly concerned about the issue of housing. It is not exactly clear how she is managing to stay in this home, but the Department's testimony was that she had been there for an extended period of time and there are no safety issues. She has maintained employment for several years.

9. [Mother] currently has criminal charges pending in both Anderson and Knox Counties. She was arrested in Anderson County in September 2013 and again in Knox County in March 2014. She initially testified that she had been charged in Anderson County with possession of a Schedule II substance (methadone) in her car. Upon further questioning, she related that she had been found slumped over the wheel in a car, blocking the bottom of a driveway, with methadone pills and liquid methadone in the car, and that she had been charged with Possession of Schedule II Drugs, Evading Arrest, and Driving on a Suspended License. Those charges are set for trial. She initially testified that her March arrest was for driving on a suspended license after she had been stopped for speeding, that she had resolved that matter by a guilty plea, and that her license remained suspended. Upon for further questioning, she stated that she had been arrested while texting at a gas pump and that her Knox County charges are also still pending and set for trial. She said she must

-14-

have gotten those particular charges confused with another recent arrest for driving on a suspending [sic] license after being stopped for speeding. She continues to drive.

10.     Upon those facts, the Court finds that [Mother] been found [sic] to have committed severe child abuse against this child.

11.     The Court further finds that [Mother] has abandoned this child in that [Mother] has willfully failed to support or make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding the filing of the petition in this cause. [Mother] testified that she is employed cleaning cabins 25 to 35 to 40 hours per week, every single week, and that she has worked for this same employer since 2008. She provided a letter from her employer confirming that testimony and noting her hourly rate of $9.75. On that income, she made token payments toward the support of this child in July, August, and September, and on October 7, 2013 (beginning the month after her appearance in the Child Support Division of this Court). She then made no further payments at all until after the termination petition was filed. That same week, an IRS intercept obtained more than One Thousand Dollars. Since the termination petition was filed, [Mother] has resumed her modest payments. During the time period relevant to this petition, [Mother] had the ability to work and had employment, as she testified. If she had not been working, there would have been no refund for IRS to intercept. She simply chose to use her funds for other purposes.

12.     The Court further finds that [Mother] has failed to comply in a substantial manner with those reasonable responsibilities set out in the permanency plan related to remedying the conditions which necessitate foster care placement. She completed the required assessments but not the recommended treatment. She got off methadone, although the procedure she used may not have been the one envisioned when the plan was developed. She was supposed to be law-abiding and resolve any legal issues. She hasn't done that. She has criminal charges pending and she is still driving around without a license.

13.     Because the Court believes that [Mother] has managed to get off methadone and is not using other illicit drugs, the Court cannot find the ground of persistence of conditions.

## III

1. [Mother] has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in her home despite reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible. In addition to her own issues, she is surrounded by a family of addicts, none of whom are available to her as an appropriate support system. She has maintained regular visitation with the child, at least recently, and he knows who she is. But he has been living in the same foster home since his discharge from the hospital in March 2013 and is well integrated into that family. He has multiple issues secondary to his *in utero* drug exposure, including feeding difficulty and multiple food allergies. He participates in therapy with Tennessee Early Intervention Services weekly and is followed by a gastroenterologist, a nutritionist, and a pediatric physiatrist. He was evaluated by a neurologist for possible seizure activity and by an endocrinologist due to issues regarding bone development. A change of caretakers and physical environment is likely to have a detrimental effect on the child's emotional, psychological and medical condition. [Mother] has committed severe child abuse toward this child. She continues to engage in criminal activity. And [Mother] has not paid child support consistent with the child support guidelines promulgated by the Department of Human Services pursuant to T.C.A. 36-5-101.

2. The child's alleged biological father is deceased. Any parental rights of [Mother's] husband have been terminated by prior order of this Court.

3. The Department of Children's Services has made reasonable efforts toward achieving permanency for this child.

4. The child is entitled to a safe, secure and loving home. He is now thriving in the care of the only family he has ever known and has the chance to achieve permanency through adoption.

5. It is, therefore, in the best interest of [the Child] and the public that all of [Mother's] parental rights to this child be terminated and the complete custody, control, and full guardianship of the child be awarded to the State of Tennessee, Department of Children's Services, with the right to place him for adoption and to consent to such adoption in loco parentis.

Mother appeals the termination of her parental rights to the Child to this Court.

## Discussion

Although not stated exactly as such, Mother raises four issues on appeal: 1) whether the Juvenile Court erred in finding that clear and convincing evidence was shown of grounds to terminate Mother's parental rights to the Child for abandonment by willful failure to pay support pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(i); 2) whether the Juvenile Court erred in finding that clear and convincing evidence was shown of grounds to terminate Mother's parental rights to the Child for substantial non-compliance with a permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2) ; 3) whether the Juvenile Court erred in finding that clear and convincing evidence was shown of grounds to terminate Mother's parental rights to the Child for severe abuse pursuant to Tenn. Code Ann. § 36-1-113(g)(4); and, 4) whether the Juvenile Court erred in finding by clear and convincing evidence that it was in the Child's best interest for Mother's parental rights to be terminated.

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

> This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

> It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208,

-17-

31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at \*\*16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

We first consider whether the Juvenile Court erred in finding that clear and convincing evidence was shown of grounds to terminate Mother's parental rights to the Child for abandonment by willful failure to pay support pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(i). In pertinent part, Tenn. Code Ann. § 36-1-113(g) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (2014). As pertinent, Tenn. Code Ann. § 36-1-102 provides:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the a [sic] parent or parents or a guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the a [sic] parent or parents or a guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

Tenn. Code Ann. § 36-1-102(1)(A)(i) (2014).

With regard to this issue, the Juvenile Court specifically found and held:

The Court further finds that [Mother] has abandoned this child in that [Mother] has willfully failed to support or make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding the filing of the petition in this cause. [Mother] testified that she is employed cleaning cabins 25 to 35 to 40 hours per week, every single week, and that she has worked for this same employer since 2008. She provided a letter from her employer confirming that testimony and noting her hourly rate of $9.75. On that income, she made token payments toward the support of this child in July, August, and September, and on October 7, 2013 (beginning the month after her appearance in the Child Support Division of this Court). She then made no further payments at all until after the termination petition was filed. That same week, an IRS intercept obtained more than One Thousand Dollars. Since the termination petition was filed, [Mother] has resumed her modest payments. During the time period relevant to this petition, [Mother] had the ability to work and had employment, as she testified. If she had not been working, there would have been no refund for IRS to intercept. She simply chose to use her funds for other purposes.

The evidence in the record on appeal shows that other than the IRS intercept, Mother made minimal and sporadic payments of child support during the entire time that the Child has been in State custody, including the relevant four month period. As this Court noted in *In re: Alyssa Y.*:

The fact that Mother's tax refund was intercepted and applied to her child support obligation is not relevant. *In re Lavanie L.*, E2008-02622-COA-R3-PT, 2009 Tenn. App. LEXIS 673, 2009 WL 3231091 at \*6 (Tenn. Ct. App. Oct. 8, 2009). As this Court noted in *Lavanie*, the interception of a tax refund does not constitute a voluntary payment of child support. *Id.* Further, the fact that Mother was due a tax refund shows that she had earnings from which support could have been paid. *Id.*

*In re: Alyssa Y.*, No. E2012-02274-COA-R3-PT, 2013 Tenn. App. LEXIS 391, \*27 (Tenn. Ct. App. June 17, 2013), *no appl. perm. appeal filed*.

The evidence in the record on appeal shows, as found by the Juvenile Court, that Mother has been employed since 2008 with the same employer, and Mother herself testified that she works "anywhere from 25 to 35 to 40 hours a week," every week and is paid $9.75 per hour.

DCS filed the petition seeking to terminate Mother's parental rights on February 25, 2014. Thus, the relevant four month period preceding the filing of the petition ran from October 25, 2013 through February 24, 2014. Mother's own testimony established that the only child support payment made during the statutorily relevant period was the IRS intercept on February 21, 2014. Mother herself made no voluntary child support payments whatsoever during that four month period. The evidence in the record on appeal does not preponderate against the Juvenile Court's finding by clear and convincing evidence that grounds were proven to terminate Mother's parental rights to the Child for willful failure to support pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(i).

We next consider whether the Juvenile Court erred in finding that clear and convincing evidence was shown of grounds to terminate Mother's parental rights to the Child for substantial non-compliance with a permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2). Parental rights may be terminated upon a finding by clear and convincing evidence that: "There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4;." Tenn. Code Ann. § 36-1-113(g)(2) (2014).

With regard to this issue, the Juvenile Court found and held, *inter alia*:

The Court further finds that [Mother] has failed to comply in a substantial manner with those reasonable responsibilities set out in the permanency plan related to remedying the conditions which necessitate foster

care placement. She completed the required assessments but not the recommended treatment. She got off methadone, although the procedure she used may not have been the one envisioned when the plan was developed. She was supposed to be law-abiding and resolve any legal issues. She hasn't done that. She has criminal charges pending and she is still driving around without a license.

We need not reiterate in full the Juvenile Court's findings relative to this issue as they are quoted fully above. We find particularly telling Mother's own testimony when questioned about her arrests wherein she stated: "I forgot. Yeah. But I am not trying to lie. I have so much stuff going on that I have to literally keep a book of appointments and issues going on that I have to keep a book." The record also contains Mother's admission that despite her multiple arrests for driving on a suspended license, Mother continues to drive and, in fact, even drove to court on the day of trial. The evidence in the record on appeal does not preponderate against the Trial Court's findings made by clear and convincing evidence relative to this issue.

Next, we consider whether the Juvenile Court erred in finding that clear and convincing evidence was shown of grounds to terminate Mother's parental rights to the Child for severe abuse pursuant to Tenn. Code Ann. § 36-1-113(g)(4). As pertinent, Tenn. Code Ann. § 36-1-113(g)(4) provides grounds for termination as follows:

> (4) The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian;

Tenn. Code Ann. § 36-1-113(g)(4) (2014).

In her brief on appeal, Mother argues and raises as an issue that DCS cannot rely upon this ground to terminate Mother's parental rights because DCS entered into a permanency plan with Mother. Mother, however, did not raise this issue at trial. A careful and thorough review of the record on appeal reveals that during final argument at trial Mother's attorney stated: "As to the ground of severe child abuse, obviously I don't have much to argue about there. There is an order that has been entered." Because Mother never

raised this issue until appeal, we find that Mother has waived the issue[2]. *See In re: Keara J.*, 376 S.W.3d 86, 104 (Tenn. Ct. App. 2012) ( holding, *inter alia*, that because the parent never raised until appeal the issue of whether DCS could rely upon the ground of severe abuse even though DCS had entered into a permanency plan with the parent, the parent had waived the issue).

With regard to the ground of severe abuse, the Juvenile Court specifically found and held:

Following a hearing on June 17, 2013, this Court found that "[the Child] was the victim of SEVERE ABUSE, as defined in TCA § 37-l-102(b)(23)(A), by [Mother] based on

a.      his mother's awareness, during her pregnancy with this child, that her use of illicit benzodiazepine in combination with her prescribed methadone could cause severe bodily injury or death to her baby. The mother was provided with written warning by her methadone treatment program on November 6, 2007, that methadone is transmitted to her unborn child and that using unauthorized drugs in addition to her prescribed methadone could harm her unborn child. She was provided with additional written warning on June 10, 2009, that combining benzodiazepine with methadone treatment could have serious health risks including decreased respiration, heart complications and potential death and that withdrawal syndrome might require hospitalization. The mother was aware that she had been indicated for severe abuse by the Department in 2010 after another of her children, [Audiona] (deceased), was exposed to methadone and benzodiazepines in utero. [The Child] had to be placed in the NICU for over a month, experienced symptoms of withdrawal, included [sic] an excessive high pitch cry, moderate to severe tremors, excessive sucking, poor feeding, and loose stools, and nasal stuffiness, and had to be treated with Diluted Oral Morphine and Phenobarbital while in the NICU and to be

---

[2]Even if we found that Mother had not waived this issue, clear and convincing evidence supporting any single ground will justify a termination order and, as discussed fully above, we affirm the Juvenile Court's finding of the existence two other separate grounds for termination. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

released home with Phenobarbital Elixir taper to address his withdrawal symptoms. This is evidence to the Court that the child suffered as the result of the mother's use of drugs that the mother knew could be harmful to the child; and

b.    her use, despite this knowledge, of illicit benzodiazepine in combination with her prescribed methadone during her pregnancy with [the Child], leading him to test positive for benzodiazepine and methadone, to suffer though drug withdrawal, and resulting in the need for his admission to the NICU and treatment with morphine and phenobarbital.

Mother admitted that she and the Child tested positive for benzos at the time of the Child's birth. She further admitted that she took benzos "[t]wice, once right before [the Child] was born and I think two or three weeks, something like that before he was born." The Juvenile Court also found, as pertinent to the ground of severe abuse:

[Mother's] fourth child, Audiona, was born on July 17, 2010. She had been exposed to methadone and benzodiazepines *in utero* and died a few months after being released from the hospital to her mother's care. [Mother] was indicated for severe abuse (neglect death) by the Department of Children's Services.

The evidence in the record on appeal does not preponderate against the Juvenile Court's findings made by clear and convincing evidence relative to this issue.

Finally, we consider whether the Juvenile Court erred in finding by clear and convincing evidence that it was in the Child's best interest for Mother's parental rights to be terminated. When considering whether termination is in a child's best interest, a court is to consider the non-exclusive list of factors contained in Tenn. Code Ann. § 36-1-113(i). Our careful and thorough review of the record on appeal reveals that the Juvenile Court did consider the relevant factors when making its determination that clear and convincing evidence existed that it was in the Child's best interest for Mother's parental rights to be terminated. We need not reiterate the Juvenile Court's detailed findings as they are quoted fully above. The evidence in the record on appeal does not preponderate against the Juvenile Court's findings made by clear and convincing evidence relevant to this issue.

As grounds for termination were proven by clear and convincing evidence and it was shown by clear and convincing evidence that the termination of Mother's parental rights was in the Child's best interest, we affirm the Juvenile Court's August 28, 2014 order terminating Mother's parental rights to the Child.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the appellant, Lori D.F.P.

_____
D. MICHAEL SWINEY, JUDGE